[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11663

_____

D.C. Docket No. 1:14-cv-03006-LMM

ANDREW FELDMAN,

Plaintiff - Appellant,

versus

AMERICAN DAWN, INC.,
VYTO TOZER,
PAUL RASBAND,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(March 3, 2017)

Before WILLIAM PRYOR, JORDAN, and BALDOCK,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

The main question presented by this appeal is whether an employee has antitrust standing to challenge a conspiracy directed at his employer because the alleged conspiracy caused the employee's termination. We must also decide whether the employee pleaded claims of racketeering, tortious interference, civil conspiracy, negligent misrepresentation, and fraud. American Dawn, Inc., a leading manufacturer of restaurant linens, fired Andrew Feldman, a restaurant linen salesman, for participating in a fraudulent scheme against ALSCO, a company that sells restaurant linens. Feldman later found employment with Baltic Linen Company, a competitor of American Dawn. After Feldman joined Baltic, Vyto Tozer, a sales manager at American Dawn, and Paul Rasband, a consultant for ALSCO, allegedly conspired to freeze Baltic out of the restaurant linens market. Feldman's job at Baltic was collateral damage of the alleged conspiracy, and he filed a complaint against American Dawn, Tozer, and Rasband that alleges violation of the antitrust laws, 15 U.S.C. § 1 *et seq.*, and several other civil claims, which the district court dismissed. Because Feldman lacks antitrust standing to challenge a conspiracy directed at Baltic and his complaint fails to state any other claim, we affirm.

## I.    BACKGROUND

According to his complaint, Andrew Feldman worked for fourteen years as a regional sales manager for American Dawn, Inc., a company that manufactures and

2

sells textiles throughout the United States. Feldman was a leading salesman to ALSCO, a company that sells linens to restaurants, and one of the largest clients of American Dawn. Feldman's primary contact at ALSCO was a consultant named Paul Rasband. Feldman's supervisor at American Dawn was Vyto Tozer. Tozer and Rasband were personal friends.

American Dawn fired Feldman in 2011 for his participation in a deferred billing scheme. Under this practice, ALSCO ordered products from American Dawn, which shipped the products, and American Dawn billed ALSCO for the products at a later date. American Dawn used deferred billing to carry over its revenues from one fiscal year to the next and to hide its shipment of substandard goods to ALSCO. Employees of American Dawn deferred the bills of about thirty percent of its accounts with ALSCO. An internal audit of ALSCO revealed the deferred billing scheme, which prompted ALSCO to open an investigation. The investigation uncovered an email sent to Feldman about the deferred billing of an American Dawn account. When ALSCO confronted American Dawn with this evidence, American Dawn blamed Feldman and fired him.

Although Feldman admitted in his complaint that he participated in the deferred billing scheme, he alleged that American Dawn fired him as "punishment" for another questionable practice of employees of American Dawn—the shipment of substandard products to ALSCO. During Feldman's time

3

at the company, American Dawn routinely substituted inferior goods for the goods that ALSCO ordered. To avoid product inspections implemented by ALSCO, Tozer directed Feldman and other employees to falsify product tests and to alter sales records. Rasband knew that the shipment of substandard products caused ALSCO to overpay American Dawn by as much as $175,000, but he requested that American Dawn repay less than half that amount. Feldman expressed concern about these practices to the management of American Dawn.

After American Dawn fired Feldman, Tozer encouraged Feldman to seek severance pay. But American Dawn refused to offer Feldman severance. Tozer told Feldman that American Dawn refused to pay him severance because Feldman accepted a position with another company, Baltic, within thirty days of his termination. When Feldman raised the issue with the owners of American Dawn, he received a different response. They told him that they fired him because of his participation in the deferred billing scheme: "your dishonesty detrimentally impacted [the] relationship [of American Dawn] with a valued customer." Feldman never received severance from American Dawn.

Baltic is a competitor of American Dawn. After it hired Feldman, Tozer and Rasband conspired to "freeze out Baltic . . . from sourcing [or] supplying commercial textiles to the restaurant linen rental market." Rasband told Feldman's supervisors that it was a "big mistake" to have hired Feldman and that Feldman

4

"was no longer welcome at ALSCO, and that no one else from Baltic could be used . . . to secure ALSCO's business." Tozer told a Baltic executive that Feldman "post-dated and re-dated bills so that [Feldman] could receive more money" during his tenure at American Dawn and that Feldman acted as an "unethical 'lone-wolf.'" Tozer and Rasband made these accusations to ensure that ALSCO remained an American Dawn customer "and not to deal with [Feldman] or Baltic."

In early 2012, Rasband requested bids on behalf of ALSCO from linens manufacturers, including Baltic and American Dawn. Although Baltic submitted one of the lowest bids overall, American Dawn won the contract because before it submitted its final bid to ALSCO, Rasband informed Tozer of the details of competing bids and American Dawn altered its proposal in response. In exchange for this information, which American Dawn failed to give to Baltic or other companies, Tozer gave Rasband gifts "and other personal benefits." The conspiracy to freeze Baltic out of the market by refusing to deal with Feldman and manipulating the bidding process led to Feldman's discharge from Baltic in May 2013.

Feldman filed a ten-count complaint against American Dawn, Rasband, and Tozer in the district court. Against all defendants, Feldman alleged violations of the federal antitrust laws, 15 U.S.C. § 1 *et seq.*, violations of the federal and Georgia Racketeering Influenced and Corrupt Organizations acts, 18 U.S.C.

§ 1961 *et seq.*, Ga. Code Ann. § 16-14-1 *et seq.*, and interference with business relations Against Rasband and Tozer, Feldman alleged a conspiracy to violate the federal and Georgia racketeering acts, interference with employment, and civil conspiracy. Against American Dawn and Tozer, Feldman alleged claims of negligent misrepresentation and fraud. American Dawn, Tozer, and Rasband moved to dismiss the complaint for failure to state a claim, and the district court granted their motions.

## II.    STANDARD OF REVIEW

We review *de novo* the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and construe all the allegations as true. *Hughes v. Lott*, 350 F.3d 1157, 1159–60 (11th Cir. 2003). A plaintiff must plausibly allege all the elements of the claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations and legal conclusions are not sufficient; the plaintiffs must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). For the claims of fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Lamm v. State St. Bank & Trust*, 749 F.3d 938, 951 (11th Cir. 2014) (negligent misrepresentation); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010) (racketeering acts). "[A] plaintiff must allege: '(1) the precise statements, documents, or misrepresentations made; (2) the time,

6

place, and person responsible for the statement; (3) the content and manner in which these statements misled the [p]laintiff[]; and (4) what the defendant[] gained by the alleged fraud.'" *Am. Dental*, 605 F.3d at 1291 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997)).

## III.   DISCUSSION

We divide our discussion in four parts. First, we explain that Feldman lacks antitrust standing because he did not suffer an antitrust injury. Second, we explain that the complaint fails to allege predicate acts of racketeering activity that were the proximate cause of Feldman's injury. Third, we explain that Feldman's complaint fails to state a claim of tortious interference with business relations, tortious interference with employment, or civil conspiracy, because American Dawn, Rasband, and Tozer were not strangers to the relationship between Feldman, Baltic, and ALSCO. Fourth, we explain that the complaint fails to state claims of fraud or negligent misrepresentation because Tozer's promise of severance pay was unenforceable as a contract.

### A.  Feldman Suffered No Antitrust Injury.

In addition to "the basic 'case or controversy' or 'injury in fact' required by Article III of the Constitution," a private plaintiff who seeks damages under the antitrust laws, such as Feldman, must establish "antitrust standing." *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir.

7

2013). To do so, Feldman must allege that he suffered an antitrust injury and that he is an "efficient enforcer" of the antitrust laws. *Id.* at 1271. An antitrust injury is the kind of injury that "the antitrust laws were intended to prevent and that flows from [the conduct that] makes [the] acts [of a defendant] unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Feldman argues that he has antitrust standing to challenge two categories of antitcompetetive conduct: conduct targeted at the labor market for Feldman's labor, and conduct targeted at the market for restaurant linens. Both arguments fail. We address each in turn.

Although "employees who are precluded from selling their labor have not necessarily suffered an antitrust injury, 'employees may challenge antitrust violations that are premised on restraining the employment market.'" *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140–41 (3d Cir. 2001) (quoting Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 377a (rev. ed. 1995) (footnotes omitted)); *see also Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1176 (5th Cir. 1976). For example, the Third Circuit ruled that former employees had standing to challenge a "no-hire agreement" between three telecommunications companies, including one company for which the employees had worked. *Eichorn,* 248 F.3d at 141–42. The companies agreed not to hire the employees of the other companies, and the plaintiffs alleged that this agreement was a restraint of the labor market in which

they were participants. *Id.* at 141–42. The court explained that the employees had standing "[b]ecause the no-hire agreement directly impeded plaintiffs' ability to sell their labor to at least three companies within the competitive market." *Id.* at 142. The Tenth Circuit reached a similar conclusion. *See Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 544–45 (10th Cir. 1995). It ruled that a former employee of Boeing had standing to challenge an agreement between Boeing and Cessna not to hire employees "away from each other." *Id.* at 543, 545. The court explained that "'[j]ust as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services.'" *Id.* at 544 (quoting Areeda & Hovenkamp, *supra*, at ¶ 377c (footnotes omitted)).

Feldman lacks antitrust standing to challenge a conspiracy "premised on restraining the employment market" for restaurant linen salesmen because he did not allege one. *Eichorn*, 248 F.3d at 141 (quoting Areeda & Hovenkamp, *supra*, at ¶ 377a (footnotes omitted)). His complaint alleges a conspiracy targeted at Baltic, not Feldman, to "freeze out Baltic . . . from sourcing [or] supplying commercial textiles to the restaurant linen rental market." Feldman's complaint alleges no agreements between competing restaurant linens producers akin to the agreements that have previously provided antitrust standing for a former employee. *See Eichorn*, 248 F.3d at 141–42, *Roman*, 55 F.3d at 544–45.

Although Feldman lost his job with Baltic because of this alleged conspiracy, his collateral injury does not change our conclusion. That one laborer suffered injury does not convert the conspiracy into one aimed at restraining competition in the labor market. Indeed, the conspiracy injured Feldman to harm Baltic and competition in the market for restaurant linens, not to harm competition in the market for restaurant linens salesmen.

Feldman also argues that he has antitrust standing to challenge the conspiracy to restrain competition in the restaurant linens market, but that argument runs counter to our precedent. Although antitrust law recognizes instances where a non-market participant has antitrust standing to challenge a conspiracy because his injury is "inextricably intertwined with the injury the conspirators sought to inflict on . . . the . . . market," *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982), that doctrine does not apply here. We have held that "[n]either an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business." *Nat'l Indep. Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984). Feldman argues that *National Independent Theatre Exhibitors* is distinguishable because in that case we explained that the "there was no evidence that any of the . . . alleged behavior was directed against [the defendant] individually," *id.*, and Feldman's complaint, in

10

contrast, alleges that American Dawn, Tozer, and Rasband targeted him individually. But whether American Dawn, Tozer, and Rasband targeted Feldman is beside the point. Feldman did not suffer an antitrust injury because his complaint alleges, like the plaintiff in *National Independent Theatre Exhibitors*, that he suffered injury in the form of lost employment as an *effect* of the conspiracy to harm the market for restaurant linens. Feldman's "financial injury" was "secondary" to the goal of reduced competition in the market for restaurant linens. *Id.* (citation omitted).

Although *National Independent Theatre Exhibitors* forecloses Feldman's alternative argument on the facts alleged, he urges us to adopt one of the holdings of *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984). We cannot do so. In *Ostrofe*, the Ninth Circuit ruled that an employee had antitrust standing to challenge anticompetitive activity involving his employer because the employee would not participate in the scheme and his employer fired him as a result. *Id.* at 744. The court explained that "the injury [the employee] sustained was such an integral part of the scheme to eliminate competition in that market" that the employee suffered antitrust injury. *Id.* at 746. This decision conflicts with our precedent. *See Nat'l Indep. Theatre Exhibitors*, 748 F.2d at 608. And there are compelling arguments against following the decision of the Ninth Circuit in any event. *See Ostrofe*, 740 F.2d at 748–52 (Kennedy, J. dissenting). Perhaps

11

recognizing these problems, the Ninth Circuit narrowed the application of *Ostrofe* to circumstances, not alleged in Feldman's complaint, where an employee was an "essential participant" in an antitrust conspiracy, the employee's termination was a "'necessary means' to accomplish the scheme, and the employee has the greatest incentive to challenge the antitrust violation." *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375–76 (9th Cir. 1996) (citation omitted). Feldman's complaint does not satisfy that standard, so his alternative theory does not help him. Feldman has not alleged a cognizable antitrust injury and does not have antitrust standing to sue American Dawn, Tozer, and Rasband.

### B. The Complaint Fails to Allege Violations of the Racketeering Acts.

The complaint fails to state claims that American Dawn, Tozer, and Rasband violated the federal and Georgia racketeering acts, 18 U.S.C. § 1961 *et seq.*, Ga. Code Ann. § 16-14-1 *et seq.*, and that Tozer and Rasband conspired to violate those acts when they colluded to conceal their participation in the deferred billing scheme and the shipment of substandard products to ALSCO. The federal and Georgia racketeering acts are "essentially identical," meaning failure to state a claim under the federal act warrants dismissal under the Georgia act. *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 n.1 (11th Cir. 2014) (citation omitted). To state a civil claim under the federal Racketeering Act, 18 U.S.C. § 1964(c), a complaint must allege "that the defendant committed a pattern of . . . predicate

12

acts," "that the plaintiff suffered injury to business or property," and "that the defendant's racketeering activity proximately caused the injury." *Id.* at 705. (citations omitted). "In order to prove a pattern of racketeering . . ., a plaintiff must show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued criminal activity." *Am. Dental Ass'n*, 605 F.3d at 1290–91. To prove proximate causation, "[t]he connection between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016) (citations omitted).

Feldman argues that the complaint alleges a pattern of predicate acts in violation of the Travel Act, 18 U.S.C. § 1952, but the text of that statute refutes his argument. The Travel Act prohibits "distribut[ing] the proceeds of" "any business enterprise involving gambling, liquor . . ., narcotics . . ., . . . prostitution . . ., extortion, bribery, . . . arson," *id.* § 1952(a)(1) & (b), or money laundering, *id.* § 1956. The complaint alleges none of these activities. Although the Travel Act incorporates the state law definition of some of these prohibited activities—*id.* § 1952(b) ("'[U]nlawful activity' means . . . extortion, bribery, or arson in violation of the laws of the State in which committed.")—it does not incorporate common law fraud.

13

In addition, Feldman argues that the complaint alleges predicate acts of wire fraud, 18 U.S.C. § 1343. Feldman contends that the complaint alleges that Tozer and Rasband used the wires to spread falsehoods about Feldman to conceal their involvement in the deferred billing of ALSCO accounts and the shipment of substandard goods to ALSCO. According to Feldman, the comments of Tozer and Rasband were part of a "campaign to portray . . . Feldman as the villain in the deferred billing saga" and those comments constitute wire fraud. We disagree.

The complaint fails to allege predicate acts of wire fraud. "[W]ire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Am. Dental*, 605 F.3d at 1290 (citation omitted). The district court explained, and we agree, that the complaint alleges only one statement—not two— made by either Tozer or Rasband over the wires in furtherance of the conspiracy to defraud ALSCO: when Rasband told Baltic managers that it was a "'big mistake' . . . to have hired . . . Feldman." We also agree with the district court that this statement is not actionable as wire fraud because it is an expression of opinion, not "a misrepresentation as to some existing fact." *Cf. United States v. Svete*, 556 F.3d 1157, 1162 (11th Cir. 2009) (citation omitted).

Even if the complaint had alleged fraudulent statements made over the wires, Feldman's argument would still fail because the statements were not the

14

proximate cause of Feldman's injury. Feldman argues that the "Complaint aver[red] that [Tozer and Rasband] urged ALSCO not to deal with . . . Feldman in furtherance of their plan to 'frame' him for the [deferred] billing scheme," and this cover-up "procured" Feldman's "constructive discharge" from the industry. But the complaint made clear that the alleged wire fraud targeted ALSCO, not Feldman, because Tozer and Rasband sought to cover up their involvement in the deferred billing scheme and the shipment of substandard goods to ALSCO. Proximate causation requires a direct relation between the "injury asserted and the injurious conduct alleged," *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (citation omitted), and, here, the alleged injurious conduct targeted ALSCO.

Feldman's complaint fails to allege violations of the federal and Georgia racketeering acts. In addition, we affirm the dismissal of Feldman's claim that Tozer and Rasband conspired to violate the racketeering acts. This claim necessarily fails because the complaint fails to allege an underlying violation of the racketeering acts. *Jackson v. BellSouth Telecomm'ns*, 372 F.3d 1250, 1269 (11th Cir. 2004).

### C. The Complaint Fails to Allege Tortious Interference with Business Relations, Tortious Interference with Employment, and Civil Conspiracy.

Under Georgia law, a claim of tortious interference with business relations requires "improper action or wrongful conduct by the defendant," while acting as a "stranger to the contract or business relation at issue." *Mabra v. SF, Inc.*, 728

S.E.2d 737, 739–40 (Ga. Ct. App. 2012) (citations omitted). "One is not a stranger to the contract just because one is not a party to the contract." *Id.* at 740 (citation omitted). Parties to an "interwoven contractual arrangement" and parties that have a "direct economic interest in or would benefit from a contract with which they are alleged to have interfered" are not strangers to that contract or relationship. *Id.* (citations omitted). The Georgia Court of Appeals has ruled that an arcade game salesman, for example, was not a stranger to a business relationship between his former employer and several of its clients despite his solicitation of those clients for his *new* employer because the salesman had developed relationships with those clients when he worked for his previous employer. *Tom's Amusement Co. v. Total Vending Servs.*, 533 S.E.2d 413, 417–18 (Ga. Ct. App. 2000).

Feldman argues that he alleged that Tozer and American Dawn tortiously interfered with Feldman's relationship with ALSCO, but we disagree. Neither Tozer nor American Dawn were strangers to Feldman's relationship with ALSCO. Like the employee in *Tom's Amusement*, the complaint alleges that Feldman developed his relationship with ALSCO during his time as an employee of American Dawn. For example, the complaint alleges that "ALSCO was . . . Feldman's biggest client," "Feldman served as one of [American Dawn]'s leading sales persons to ALSCO," and "[a]n implied . . . contractual relationship between . . . Feldman and ALSCO arose through the course of his dealings with ALSCO."

16

Feldman argues that although he sold "to ALSCO as an [American Dawn] employee, any relationship he would have with ALSCO as a *Baltic* employee would be independent of his prior status as an [American Dawn] employee." But this argument misconstrues the allegations in the complaint. His relationship with ALSCO at Baltic was interwoven with, or derivative of, his time at American Dawn.

Feldman also argues that the complaint states a claim of tortious interference against Rasband because Rasband was a stranger to Feldman's relationship with ALSCO, but we decline to decide this argument because Feldman failed to make it to the district court. We will not consider arguments raised for the first time on appeal. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). We affirm the dismissal of the claim of tortious interference with a business relationship.

We also affirm the dismissal of Feldman's claim of tortious interference with employment against Rasband and Tozer. Feldman failed to preserve his argument that Rasband interfered with his employment relationship with Baltic because he raises it for the first time on appeal. *Id.* Likewise, he failed to preserve his claim of tortious interference with employment against Tozer because he made his argument that Tozer was a joint tortfeasor with Rasband for the first time in his motion for reconsideration. *Cf. O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th

17

Cir. 1992) ("Motions to amend should not be used to raise arguments which could, and should, have been made before the judgment was issued.").

Finally, we affirm the dismissal of the claim of civil conspiracy against Tozer and Rasband. The district court ruled, and we agree, that the claim of civil conspiracy necessarily fails because the complaint fails to allege underlying claims of tortious interference. "Absent [an] underlying tort, there can be no liability for civil conspiracy." *Best Jewelry Mfg. Co. v. Reed Elsevier Inc.*, 780 S.E.2d 689, 697 (Ga. Ct. App. 2015) (citation omitted).

## D. The Complaint Fails to State Claims of Negligent Misrepresentation and Fraud.

The district court correctly dismissed Feldman's claims of negligent misrepresentation and fraud predicated on Tozer's allegedly false promise that American Dawn would pay Feldman severance. Feldman has abandoned his claim of negligent misrepresentation because, apart from one passing reference to the claim in his opening brief, the issue "has not been briefed before the court." *Access Now*, 385 F.3d at 1330. And we agree with the district court that the complaint fails to state a claim of fraud.

"Fraud cannot be predicated upon statements which are promissory in their nature as to future acts," *Alston v. Brown Transp. Corp.*, 356 S.E.2d 517, 518 (Ga. Ct. App. 1987) (citation omitted), unless "there [was] a present intention not to perform or a present knowledge that the future event will not occur," *Taylor v.*

18

*Amisub, Inc.*, 368 S.E.2d 791, 793 (Ga. Ct. App. 1988) (citations omitted). But,

this exception does not apply where the "promises upon which the []appellant[]

rel[ies] . . . were unenforceable [as a contract] even absent any fraud at the time of

their utterance." *Id.* (citation omitted). Feldman's complaint fails to allege that

Tozer or American Dawn "promised to pay [him] any determinable sum as

severance pay," and "[b]ecause price is an essential element of a valid contract,"

*McLane v. Atlanta Mkt. Ctr. Mgmt. Co.*, 486 S.E.2d 30, 35–36 (Ga. Ct. App.

1997), *rev'd on other grounds*, 503 S.E.2d 278 (Ga. 1998), the complaint fails to

state a claim of fraud. *See Amisub*, 368 S.E.2d at 793.

The decisions that Feldman argues compel reversal are distinguishable. *Sims

v. Bayside Capital, Inc.* involved a promise to pay severance that was significantly

more detailed than the alleged promise made by Tozer. 755 S.E.2d 520, 523 (Ga.

Ct. App. 2014) (explaining that the promise to pay severance included "six months

of his salary as severance, . . . health insurance coverage through the end of 2011,

and a payment of $175,000 as reimbursement for legal fees."). Likewise, the

promise to pay severance in *Vernon v. Assurance Forensic Accounting, LLC* was

in writing and industry custom supported finding an enforceable severance

contract. 774 S.E.2d 197, 205–06 (Ga. Ct. App. 2015). We affirm the dismissal of

Feldman's claims of negligent misrepresentation and fraud.

## IV.    CONCLUSION

We **AFFIRM** the dismissal of Feldman's complaint.