*PRELIMINARY PRINT*

VOLUME 605 U. S. PART 2

PAGES 395–421

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 12, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

MARTIN, INDIVIDUALLY AND AS PARENT AND NEXT
FRIEND OF G. W., A MINOR, ET AL. *v.* UNITED
STATES ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE ELEVENTH CIRCUIT

No. 24–362.   Argued April 29, 2025—Decided June 12, 2025

On October 18, 2017, the FBI raided the wrong house in suburban Atlanta.
Officers meant to execute search and arrest warrants at a suspected
gang hideout at 3741 Landau Lane but instead stormed 3756 Denville
Trace, a quiet family home occupied by petitioners Hilliard Toi Cliatt,
his partner Curtrina Martin, and her 7-year-old son.   A six-member
SWAT team breached the front door, detonated a flash-bang grenade,
and assaulted the innocent occupants before realizing their mistake.
The cause of the error was Special Agent Guerra's reliance on a personal
GPS device, combined with the team's failure to notice the street sign
for "Denville Trace" and the house number visible on the mailbox.   Left
with personal injuries and property damage, petitioners sued the United
States under the Federal Tort Claims Act (FTCA), 28 U. S. C. §2671
*et seq.*, seeking damages resulting from the officers' alleged negligent
and intentional actions during the raid.   The district court granted
summary judgment to the government.   The Eleventh Circuit affirmed,
applying a unique approach to FTCA claims.

The FTCA waives the federal government's sovereign immunity from suit
as to certain torts committed by federal employees acting within the
scope of their employment.   But that waiver is subject to statutory ex-
ceptions, including two relevant to a law enforcement misconduct case
like this one.   The first is the intentional-tort exception in §2680(h),
which bars claims against the government for 11 enumerated intentional
torts.   The second is the discretionary-function exception in §2680(a),
which bars claims against the government that are based on an official's
exercise of discretionary functions.   Section 2680(h) also contains a
"law enforcement proviso" which countermands the intentional-tort ex-
ception, allowing suits for six specified torts (including assault, battery,
false imprisonment, and false arrest) to proceed against the United
States when the torts are committed by "investigative or law enforce-
ment officers."   While most courts hold that the law enforcement pro-
viso applies only to the intentional-tort exception, the Eleventh Circuit's
approach is different in two key respects.   First, the Eleventh Circuit
alone holds that the proviso overrides all exceptions in §2680, including

Syllabus

the discretionary-function exception, meaning that intentional-tort claims covered by the proviso automatically proceed to the merits without further analysis of other applicable § 2680 exceptions. Second, to compensate for this plaintiff-friendly approach, the Eleventh Circuit permits the government to assert a restrictive Supremacy Clause defense at the liability stage, allowing the government to escape liability when an officer's actions have "some nexus with furthering federal policy" and reasonably "compl[y] with the full range of federal law." *Denson* v. *United States*, 574 F. 3d 1318, 1348.

Applying its distinctive approach, the Eleventh Circuit held that the law enforcement proviso protected petitioners' intentional-tort claims from both the intentional-tort and discretionary-function exceptions. The court dismissed petitioners' negligence claims under the discretionary-function exception, reasoning that Special Agent Guerra enjoyed discretion in preparing for the warrant execution. On the merits of the remaining intentional-tort claims, the court found the government had a valid Supremacy Clause defense and granted summary judgment for the United States.

*Held:*

1. The law enforcement proviso in § 2680(h) overrides only the intentional-tort exception in that subsection, not the discretionary-function exception or other exceptions throughout § 2680. Pp. 403–408.

(a) The text and structure of § 2680 demonstrate that the law enforcement proviso applies only to the intentional-tort exception. The proviso appears within the same subsection and sentence as the intentional-tort exception, reflecting the established principle that statutory provisos generally modify only the provisions in which they appear. Section 2680 contains 13 discrete exceptions. Coupled with the lead-in clause, each exception forms a separate sentence and operates as a structurally distinct provision. The proviso addresses the same subject matter as subsection (h)—intentional torts—while other exceptions cover entirely different topics like lost mail, combat injuries, and quarantine impositions. Further, the proviso's definitional sentence expressly limits the definition of "investigative or law enforcement officer" to "this subsection" (*i. e.*, subsection (h)), even though the phrase "law enforcement officer" appears elsewhere in § 2680. Congress's choice to embed the proviso within subsection (h) rather than place it at the end of the full list of exceptions, as it sometimes does with broadly applicable provisos, further confirms the proviso's limited application to subsection (h) alone. Pp. 404–407.

(b) Petitioners' arguments for broader application of the proviso are unpersuasive. While the proviso mirrors the language of § 2680's

lead-in clause by stating that §1346(b) "shall apply" rather than "shall not apply," this textual similarity does not demonstrate that the proviso applies to all exceptions, which form discrete instructions that may be understood completely without reference to other provisions. The absence of limiting language in the proviso's first sentence does not expand its scope beyond subsection (h), as Congress accomplished that limitation through the proviso's placement within the same sentence as the intentional-tort exception. Legislative history suggesting Congress intended to address wrong-house raids broadly cannot displace what the law's terms clearly direct, as legislative history is not the law and Members of Congress may have had multiple purposes in mind when crafting the proviso. Pp. 407–408.

2. The Supremacy Clause does not afford the United States a defense in FTCA suits. The FTCA is the "supreme" federal law governing the United States' tort liability and serves as the exclusive remedy for damages claims arising from federal employees' official conduct. The statute generally makes the government liable under state law on the same terms as a private individual would be liable under the law of the place where the tortious conduct occurred. Because the FTCA incorporates state law as the liability standard, there is typically no conflict between federal and state law for the Supremacy Clause to resolve. While federal law may sometimes displace state law in FTCA suits where a constitutional text or federal statute supplies controlling liability rules, the Eleventh Circuit identified no such federal statute or constitutional provision displacing Georgia tort law in this case. The court's reliance on *In re Neagle*, 135 U. S. 1, is misplaced, as that 19th-century decision involved a federal officer's immunity from state criminal prosecution for acts necessary and proper in discharging federal duties, not the federal government's liability under a statute that expressly subjects it to state tort law on the same terms as private parties. Section 2674 specifies the defenses available to the government, including judicial or legislative immunity and other defenses to which the United States is entitled, but these do not include the Eleventh Circuit's novel Supremacy Clause defense. Pp. 409–413.

3. On remand, the Eleventh Circuit should consider whether subsection (a)'s discretionary-function exception bars either the plaintiffs' negligent- or intentional-tort claims—undertaking that assessment without reference to the mistaken view that the law enforcement proviso applies to subsection (a). The court must then ask of any surviving claims whether, under Georgia state law, a "private individual under like circumstances" would be liable for the acts and omissions the plaintiffs allege, subject to the defenses discussed in §2674—not a Supremacy Clause defense.

Opinion of the Court

Remaining questions surrounding whether and under what circumstances the discretionary-function exception may ever foreclose a suit like this one lie well beyond the two questions the Court granted certiorari to address, and their resolution would benefit from the Eleventh Circuit's careful reexamination of this case in the first instance. Pp. 413–415.

Vacated and remanded.

GORSUCH, J., delivered the opinion for a unanimous Court. SOTOMAYOR, J., filed a concurring opinion, in which JACKSON, J., joined, *post*, p. 415.

*Patrick Jaicomo* argued the cause for petitioners. With him on the briefs were *Anya Bidwell* and *Jared McClain.*

*Frederick Liu* argued the cause for respondents. With him on the brief were *Acting Solicitor General Harris, Acting Assistant Attorney General Roth, Deputy Solicitor General Kneedler,* and *Joshua M. Salzman.*

*Christopher Mills,* by invitation of the Court, 604 U. S. 1115, argued the cause and filed a brief as *amicus curiae* in support of the judgment below on Question 1.*

JUSTICE GORSUCH delivered the opinion of the Court.

If federal officers raid the wrong house, causing property damage and assaulting innocent occupants, may the homeowners sue the government for damages? The answer is

———————

*Briefs of *amici curiae* urging reversal were filed for America's Future et al. by *William J. Olson, Jeremiah L. Morgan, Robert J. Olson,* and *Jeffrey C. Tuomala*; for the Constitutional Accountability Center by *Elizabeth B. Wydra* and *Brianne J. Gorod*; for Members of Congress by *Jonathan C. Bond, Jeff Liu,* and *Lavi M. Ben Dor*; for the National Police Accountability Project et al. by *Charles A. Rothfeld, Paul W. Hughes, Eugene R. Fidell,* and *John W. Whitehead*; for the New Civil Liberties Alliance by *Casey Norman, Jenin Younes,* and *Mark Chenoweth*; for the North Central Pennsylvania Trial Lawyers Association by *Paul Koster*; for Public Accountability et al. by *Athul K. Acharya, Clark M. Neily III, Cecillia D. Wang, Brett M. Kaufman, Scott Michelman,* and *Cory Isaacson*; for Public Citizen by *Scott L. Nelson* and *Allison M. Zieve*; and for Gregory C. Sisk by *Geoffrey M. Pipoly* and *Matthew Stanford.*

not as obvious as it might be. All agree that the Federal Tort Claims Act permits some suits for wrong-house raids. But the scope of the Act's permission is much less clear. This case poses two questions about the Act's application: one concerning the FTCA's sovereign-immunity waiver, and the other touching on the defenses the United States may assert.

## I

### A

In the predawn hours of October 18, 2017, the Federal Bureau of Investigation raided the wrong house in suburban Atlanta. Officers meant to execute search and arrest warrants at a suspected gang hideout, 3741 Landau Lane. Instead, they stormed a quiet family home, 3756 Denville Trace, occupied by Hilliard Toi Cliatt, his partner Curtrina Martin, and her 7-year-old son G. W. App. to Pet. for Cert. 3a–4a.

A six-member SWAT team, led by FBI Special Agent Lawrence Guerra, breached the front door and detonated a flash-bang grenade. *Id.*, at 7a–8a. Fearing a home invasion, Mr. Cliatt and Ms. Martin hid in a bedroom closet. *Id.*, at 8a. But the SWAT team soon found the couple's hiding spot, dragged Mr. Cliatt from the closet, "threw [him] down on the floor," handcuffed him, and began "bombarding [him] with . . . questions." *Id.*, at 79a. Meanwhile, another officer trained his weapon on Ms. Martin, who was lying on the floor half-naked, having fallen inside the closet. *Id.*, at 8a, 89a. Only then did another officer stumble across some mail with the home's address on it and realize the team had the wrong house. *Id.*, at 8a.

The cause of the officers' mistake? In preparation for the raid, Agent Guerra visited the correct house to document its features and identify a staging area for the SWAT team. *Id.*, at 5a. But, he says, when he used his personal GPS to navigate to 3741 Landau Lane on the day of the raid, it led

him to 3756 Denville Trace. 631 F. Supp. 3d 1281, 1287 (ND Ga. 2022). No one could confirm as much later because Agent Guerra "threw . . . away" his GPS device "not long after" the raid. *Id.*, at 1288. And it seems the agents noticed neither the street sign for "Denville Trace" nor the house number, which was visible on the mailbox at the end of the driveway. *Ibid.*; Tr. of Oral Arg. 38. Apparently, too, Agent Guerra failed to appreciate that a different car was parked in the driveway, one "not present . . . during [his] previous visit." 631 F. Supp. 3d, at 1288.

Left with personal injuries and property damage—but few explanations and no compensation—Mr. Cliatt and Ms. Martin sued the United States. They did so under the Federal Tort Claims Act, 28 U. S. C. §2671 *et seq.*, alleging that the officers had committed various negligent and intentional torts, App. 8–14.

B

After discovery and motions practice, the district court rejected each of the plaintiffs' claims and granted summary judgment to the government. The Eleventh Circuit affirmed and, in doing so, relied on an understanding of the FTCA that no other circuit has adopted. To appreciate what sets the Eleventh Circuit apart and how its approach affected its analysis of the plaintiffs' claims, it helps to begin by outlining how this suit would have proceeded elsewhere.

The FTCA allows those injured by federal employees to sue the United States for damages. The statute achieves that end by waiving, in 28 U. S. C. §1346(b), the federal government's sovereign immunity for "certain torts committed by federal employees acting within the scope of their employment." *Brownback* v. *King*, 592 U. S. 209, 212 (2021) (internal quotation marks omitted). But the statute's waiver is subject to 13 exceptions that claw back the government's immunity in certain circumstances. Set out in §2680, most of these 13 exceptions are obviously inapplicable to suits alleging police misconduct within the United States.

But two in particular—the discretionary-function exception and the intentional-tort exception—sometimes come into play.

In a suit like this one, most courts begin by assessing the intentional-tort exception. Located in subsection (h) of § 2680, it prohibits claims alleging any of 11 enumerated torts. But the exception is itself subject to a "law enforcement proviso." *Millbrook* v. *United States*, 569 U. S. 50, 55 (2013). That proviso countermands the exception with respect to six intentional torts (including assault, battery, false imprisonment, and false arrest) by "investigative or law enforcement officers." § 2680(h). So if a plaintiff alleges that a federal law enforcement officer committed one or more of those six torts, the proviso will ensure those claims survive an encounter with the intentional-tort exception. *Id.*, at 55–56.

Next, most courts turn to the discretionary-function exception. Housed in subsection (a) of § 2680, this exception bars "[a]ny claim" based on the exercise of an official's "discretionary function." Faced with that instruction, most courts ask whether the exception precludes any of the plaintiff's remaining tort claims. And here, the answer is often less clear cut. The discretionary-function exception, this Court has said, forbids suits challenging decisions that "involv[e] an element of judgment or choice" of a "kind that the . . . exception was designed to shield." *United States* v. *Gaubert*, 499 U. S. 315, 322–323 (1991) (alteration in original; internal quotation marks omitted). But several of our lower court colleagues report that they have "struggl[ed]" to discern what this direction requires of them. See, *e. g.*, *Xi* v. *Haugen*, 68 F. 4th 824, 842 (CA3 2023) (Bibas, J., concurring). So, for example, some lower courts have held that the discretionary-function exception does not shield "careless" or "unconstitutional" police conduct from judicial scrutiny, but others have taken a contrary view and read the exception much more broadly. *Id.*, at 843; Pet. for Cert. 28–34.

Finally, if any of the plaintiff's claims survive the discretionary-function exception and thus fall within the FTCA's waiver of sovereign immunity, courts turn to a third question: Is the government liable to the plaintiff on the merits? When it comes to that question, the FTCA provides that the government will usually be liable to the plaintiff if a "private individual under like circumstances," §2674, would be liable under "the law of the place" where the government employee's wrongful "act or omission occurred," §1346(b)(1). Ordinarily, then, courts will find for the plaintiff if he can demonstrate that federal officials committed a tort under applicable state law. See *Brownback*, 592 U. S., at 218.

Now compare that approach to the Eleventh Circuit's. That court begins much as others do, asking whether the law enforcement proviso permits a plaintiff's intentional-tort claims to advance past subsection (h)'s intentional-tort exception. See *Nguyen* v. *United States*, 556 F. 3d 1244, 1260 (2009).

But from there, the Eleventh Circuit proceeds quite differently. Rather than asking whether the discretionary-function exception bars *either* the plaintiff's negligent-tort claims *or* his intentional-tort claims, as most courts do, the Eleventh Circuit applies that exception *only* to the plaintiff's negligence claims. The Eleventh Circuit does so because, in its view, the law enforcement proviso does not just override the intentional-tort exception, it also overrides all the other exceptions in §2680, the discretionary-function exception included. *Id.*, at 1257. Under that approach, any intentional-tort claim covered by the proviso automatically proceeds to the merits—no matter what any other exception has to say.

To compensate for its expansive and plaintiff-friendly reading of the proviso, the Eleventh Circuit then takes a restrictive and defendant-friendly view at the FTCA's liability stage. In other courts, an FTCA plaintiff will usually prevail if he can show a "private individual under like circumstances," §2674, would be liable under "the law of the place"

where the government employee's wrongful "act or omission occurred," §1346(b)(1). But in the Eleventh Circuit, the government may assert a particular affirmative defense under the Constitution's Supremacy Clause. See *Denson* v. *United States*, 574 F. 3d 1318, 1347 (2009). And that defense, the Eleventh Circuit holds, defeats a claim whenever a law enforcement officer's contested actions bear "some nexus with furthering federal policy and can reasonably be characterized as complying with the full range of federal law." *Id.*, at 1348; accord, *Kordash* v. *United States*, 51 F. 4th 1289, 1293 (CA11 2022).

Applying its unique approach to this case, the Eleventh Circuit held that the law enforcement proviso spared the plaintiffs' intentional-tort claims from both the intentional-tort and the discretionary-function exceptions. It dismissed the plaintiffs' negligence claims under the discretionary-function exception because, in its view, Agent Guerra "enjoyed discretion in how he prepared for the warrant execution." App. to Pet. for Cert. 17a–18a. And on the merits of the plaintiffs' (remaining) intentional-tort claims, the court held that the government had a winning Supremacy Clause defense. As a result, the Eleventh Circuit concluded, the United States was entitled to summary judgment. *Id.*, at 18a–19a.

We agreed to take this case to examine the distinctive features of the Eleventh Circuit's approach—namely (1) whether the law enforcement proviso overrides not just the intentional-tort exception but also the discretionary-function exception, and (2) whether the Supremacy Clause affords the United States a defense in FTCA suits. Pet. for Cert. 16, 25. 604 U. S. 1103 (2025).

II

Begin with the law enforcement proviso. Does it countermand only §2680(h)'s intentional-tort exception, as most circuits have concluded and the government argues? Brief for Respondents 25; *Xi*, 68 F. 4th, at 842 (Bibas, J., concurring)

(collecting cases). Or does the proviso also override the other exceptions in § 2680, including the discretionary-function exception in subsection (a), as the Eleventh Circuit has held and the plaintiffs contend? *Nguyen*, 556 F. 3d, at 1257; Brief for Petitioners 40.

A

To answer that question, we turn to the relevant statutory text. Recall that § 1346(b) waives the federal government's sovereign immunity, subject to a list of 13 exceptions housed in § 2680. Those exceptions are lettered (a) through (n), with one letter unused. Rather than setting the law enforcement proviso apart as a discrete provision at the end of that list, Congress folded it into subsection (h)'s intentional-tort exception. Here's a sense of how the proviso (underlined below) appears in context.

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

.          .          .          .          .

"(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery,

false imprisonment, false arrest, abuse of process, or malicious prosecution.   For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

.          .          .          .          .

   "(n)  Any claim arising from the activities of a Federal land bank, a Federal intermediate credit bank, or a bank for cooperatives."

The proviso's placement supplies an immediate clue about the scope of its application.   It appears in the same subsection (and the same sentence) as the intentional-tort exception.   Given that arrangement, an ordinary reader would naturally presume that the proviso modifies only subsection (h).   An everyday example helps illustrate the point.   Suppose a wife leaves her husband a shopping list: "Please buy—Apples.  Carrots.  Steak: If there is a sale.  Bread.  Milk." The wife, we think, would be understandably frustrated if her husband returned home with only steak in hand because he could find nothing else discounted.   Reflecting that intuition about ordinary meaning, our cases recognize that, absent reason to think otherwise, statutory provisos generally modify only the provisions in which they sit.   See *McDonald* v. *United States*, 279 U. S. 12, 20–21 (1929); *Alaska* v. *United States*, 545 U. S. 75, 106 (2005); A. Scalia & B. Garner, Reading Law 154–155 (2012) (Scalia & Garner).

   Nothing about §2680(h)'s proviso gives us reason to think it works differently.   To the contrary, one textual clue after another confirms that it follows the general rule.   Start with the statute's grammatical structure.   Section 2680 contains a lead-in clause ("The provisions of this chapter and section 1346(b) of this title shall not apply to—") followed by a list of exceptions.   In conjunction with the lead-in clause, each exception forms a stand-alone sentence ending with a period, operating as a "distinct," "structurally discrete" provision.

*Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 344, and n. 4 (2005). And, given that, it is hard to see how the law enforcement proviso might apply beyond subsection (h), modifying exceptions housed in separate subsections (and separate sentences) elsewhere in §2680.

Notice, too, that subsection (h) and its proviso work together to address the same category of claims: intentional torts. Subsection (h)'s intentional-tort exception excludes from the FTCA's sovereign-immunity waiver claims for torts like "assault, battery, false imprisonment, [and] false arrest." The proviso then undoes that assertion of sovereign immunity for some of those same torts when committed by "investigative or law enforcement officers." By contrast, the proviso does not so much as mention the issues addressed by §2680's other exceptions, like claims for lost mail, combat injuries, or the imposition of quarantines. §2680(b), (f), (j). That the proviso is "confined" to the same "subject-matter" as subsection (h)'s "principal clause" stands as more evidence yet that it "refers only to the provision to which it is attached." *United States* v. *Morrow*, 266 U. S. 531, 535 (1925).

The proviso's second sentence is telling as well. It defines the phrase "investigative or law enforcement officer." In doing so, the sentence tells us that the definition applies only to "this subsection" (*i. e.*, subsection (h)), even though the phrase "law enforcement officer" also appears in subsection (c)'s exception for claims arising from tax and customs collection. §2680(c), (h). If Congress had wished the proviso to modify each of the exceptions in §2680, it might have provided a section-wide definition, rather than a limited definition just for subsection (h).

If more evidence were needed, comparing this statute with others would supply it. Often, Congress drafts statutory lists followed by a proviso in a separate paragraph at the end. See, *e. g.*, 42 U. S. C. §§1383(a)(2)(F)(ii)(II), 6928(f)(2). Sometimes, that placement can suggest that a proviso relates

to all the preceding subparts, not just the nearest one. Scalia & Garner 156. But here Congress chose a different course, folding the proviso into a single exception, rather than appending it to the end of the full list of exceptions. And that choice, too, suggests this proviso applies to subsection (h) alone. See *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. 685, 704 (2022).

B

Seeking to defend the Eleventh Circuit's view that the proviso applies broadly across all of §2680's exceptions, the plaintiffs offer a number of thoughtful arguments. But, to our eyes, none can overcome the textual evidence we have just laid out.

First, the plaintiffs ask us to focus on how the proviso mirrors §2680's lead-in clause. Brief for Petitioners 42. The lead-in clause, they observe, preserves the government's sovereign immunity by instructing that §1346(b)'s waiver "*shall not apply to*" claims covered by the exceptions. §2680 (emphasis added). Meanwhile, the proviso countermands that direction by instructing that §1346(b)'s waiver "*shall apply*" to certain claims. §2680(h) (emphasis added). Because the language of the proviso mirrors the language of the lead-in clause, the plaintiffs submit, Congress must have meant for the proviso to have the last word with respect to each of the FTCA's exceptions. *Id.*, at 42. That conclusion, however, does not follow from its premise. Yes, the proviso and lead-in clause contain similar language. And, yes, the proviso surely countermands the lead-in clause for purposes of subsection (h). But none of that means the proviso speaks to other exceptions that work together with the lead-in language to form discrete instructions that "may be understood completely without reading any further." *Jama*, 543 U. S., at 344.

Second, the plaintiffs remind us that the proviso's second, definitional sentence applies to "this subsection," but the proviso's first, substantive part contains no such limiting lan-

guage. Brief for Petitioners 42–43 (quoting § 2680(h)). And that difference, the plaintiffs say, suggests that the first, substantive part applies throughout § 2680. *Id.*, at 42–43. Again, however, we do not see it. Congress had no need to include similar limiting language in the first part of the proviso to confine its application to subsection (h). Congress accomplished just that by placing the proviso's first part in the same sentence as the intentional-tort exception. Meanwhile, in the proviso's second sentence, Congress arguably needed to confine the definition of "investigative or law enforcement officer" to "this subsection" to ensure that the phrase "law enforcement officer" carries a different meaning when it appears in subsection (c).

Third, the plaintiffs resort to legislative history. They point to a committee report discussing how Congress enacted the proviso in response to two wrong-house raids much like their own. *Id.*, at 8–10, 44; see S. Rep. No. 93–588, p. 3 (1973). And, the plaintiffs argue, unless the proviso is given broad effect across § 2680, it will not fulfill Congress's purpose of ensuring that wrong-house-raid cases may proceed. But this argument stumbles, too. Few pieces of legislation pursue any single "purpos[e] at all costs." *American Express Co.* v. *Italian Colors Restaurant*, 570 U. S. 228, 234 (2013) (internal quotation marks omitted). And Members of Congress may well have had more than one purpose in mind when adding the proviso to the FTCA. Perhaps some thought amending subsection (h) alone and leaving others untouched would strike a suitable balance between immunity and liability. Perhaps others concluded there was no need to apply the proviso more broadly because no other exception would shield the government from liability for wrong-house raids. Whatever the reason, no amount of guesswork about the purposes behind legislation can displace what the law's terms clearly direct. "[L]egislative history is not the law." *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 523 (2018).

### III

That takes us to the Eleventh Circuit's second outlier position and the second question presented. May the United States defeat an FTCA suit by invoking the Supremacy Clause and showing that a federal officer's acts had "some nexus with furthering federal policy" and "compl[ied] with the full range of federal law"? App. to Pet. for Cert. 17a (internal quotation marks omitted). Because the government now concedes that it enjoys no such defense, the Court appointed Christopher Mills as *amicus* to represent the Eleventh Circuit's views. 604 U. S. 1115 (2025). He has ably discharged his responsibilities. But in the end, we find the government's concession commendable and correct: The FTCA does not permit the Eleventh Circuit's Supremacy Clause defense.

The Supremacy Clause supplies a rule of decision when federal and state laws conflict. It provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. So, for example, when a regulated party cannot comply with both federal and state directives, the Supremacy Clause tells us the state law must yield. See, *e. g.*, *Virginia Uranium, Inc.* v. *Warren*, 587 U. S. 761, 767 (2019) (opinion of GORSUCH, J.).

The FTCA is the "supreme" federal law addressing the United States' liability for torts committed by its agents. It supplies the "exclusive remedy" for damages claims arising out of federal employees' official conduct. See *Hui* v. *Castaneda*, 599 U. S. 799, 806 (2010). And, as we have seen, the government will usually be liable if a "private individual under like circumstances," § 2674, "would be liable to the claimant in accordance with the law of the place where the act or omission occurred," § 1346(b)(1). Accordingly, a plaintiff may generally prevail in an FTCA suit by demonstrating

that "the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward." *Carlson* v. *Green*, 446 U. S. 14, 23 (1980).

Because the FTCA's liability rule incorporates state law, in most cases there is no conflict for the Supremacy Clause to resolve. Take this case. Georgia law supplies the relevant "law of the place" where the officers' tortious conduct occurred. § 1346(b)(1). And Georgia law would permit a homeowner to sue a private person for damages if that person intentionally or negligently raided his house and assaulted him. See App. 10–13 (citing *Hendricks* v. *Southern Bell Tel. & Tel. Co.*, 193 Ga. App. 264, 264–265, 387 S. E. 2d 593, 594–595 (1989), for assault and battery and *Lyttle* v. *United States*, 867 F. Supp. 2d 1256, 1301 (MD Ga. 2012), for negligence). So when the FTCA, the relevant federal law in this field, instructs courts to apply those same state rules to decide whether the United States is liable to the plaintiffs, there is no discord between the two.

To be sure, it is possible (though rare) for federal and state law to conflict in an FTCA suit. So, for example, in *Hess* v. *United States*, this Court held that federal maritime law supplied the "law of the place" governing an FTCA suit involving an accident on the Columbia River. 361 U. S. 314, 318, and n. 7 (1960). Though the accident "occurred within the State of Oregon," it happened "on navigable waters . . . within the reach of admiralty jurisdiction." *Id.*, at 318. As a result, federal maritime law displaced state tort law, just as it would in "an action between private parties." *Ibid*, n. 7. In much the same way, federal law will control other FTCA suits where "a litigant [can] point specifically to a constitutional text or a federal statute" that supplies controlling liability rules, displacing contrary state law. *Virginia Uranium*, 587 U. S., at 767 (internal quotation marks omitted); see, *e. g.*, *PLIVA, Inc.* v. *Mensing*, 564 U. S. 604, 618 (2011).

In this case, however, the Eleventh Circuit did not identify any federal statute or constitutional provision displacing Georgia tort law. Instead, the court of appeals pointed to a

line of cases stemming from this Court's decision in *In re Neagle*, 135 U. S. 1, 75 (1890). App. to Pet. for Cert. 16a–17a (citing *Denson*, 574 F. 3d, at 1336–1337). Those cases, the Eleventh Circuit has observed, hold that federal officers may sometimes defeat state prosecutions against them by demonstrating that their actions, though criminal under state law, were "necessary and proper" in the discharge of their federal responsibilities. *Id.*, at 1346–1347 (discussing *In re Neagle*). In the Eleventh Circuit's view, that same logic works to foreclose FTCA suits like the plaintiffs'. 574 F. 3d, at 1346–1347; *Kordash*, 51 F. 4th, at 1293–1294.

To appreciate why that view is mistaken, a little history helps. *In re Neagle* involved an affair, a homicide, and a habeas petition. In 1883, Sarah Althea Hill claimed to be the wife of U. S. Senator William Sharon and sought a share of his fortune in acrimonious California divorce proceedings. Sharon admitted an affair but insisted that Hill had forged the pair's handwritten marriage contract. Hill hired David Terry to represent her. A former Chief Justice of the California Supreme Court, Terry had resigned that post after killing (another) U. S. Senator in a duel. As the litigation wore on, lawyer and client married.

Eventually, the dispute between Hill and Sharon wound up before U. S. Supreme Court Justice Stephen Field while he was riding circuit. Terry and Justice Field were no strangers, having served together on the California Supreme Court. Even so, Justice Field issued a devastating ruling against Hill. As he announced his decision, Hill leapt from her seat, denounced the Justice as "bought," and had to be carried from the courtroom. Joining the fracas, Terry punched a marshal and brandished a bowie knife. Even after the couple spent time in jail for contempt, they continued to issue threats against Justice Field.[1]

---

[1] For a full account of the saga, see *In re Neagle*, 135 U. S., at 42–55; W. Lewis, The Supreme Court and a Six-Gun: The Extraordinary Story of *In re Neagle*, 43 A. B. A. J. 415 (1957) (Lewis).

Those events found their way into the U. S. Reports this way. Aware of the threat Hill and Terry posed, the U. S. Attorney General ordered Deputy Marshal David Neagle, a former chief of police in Tombstone, Arizona, to accompany Justice Field when he next rode circuit in California. Lewis 478; *In re Neagle*, 135 U. S., at 51–52. That decision proved prescient, for Terry soon cornered the Justice on a train and attacked him. *Id.*, at 52–54. Intervening to protect the Justice, Neagle shot and killed Terry. *Ibid.* After the shooting, California authorities arrested Neagle and began prosecuting him for murder. Neagle countered by filing a petition for a writ of habeas corpus in federal court seeking his release. *Ibid.*

When Neagle's petition reached this Court, it agreed the writ should issue, reasoning that the Supremacy Clause shielded him from state criminal charges. Without some such protection, the Court concluded, California could frustrate federal law by prosecuting a federal marshal "for an act which he was authorized to do by the law of the United States," an act "which it was his duty to do," and in circumstances where he "did no more than what was necessary and proper." *Id.*, at 75–76.

Memorable as *In re Neagle* may be, we do not see how it informs the prosaic task of applying the FTCA. The Court's decision may stand for the proposition that federal law will sometimes preempt a state criminal law when it conflicts with a federal officer's duties—and do so even in the absence of express federal legislation overriding the state law in question. But *In re Neagle* does not speak to a situation where, as here, Congress has entered the field and expressly bound the federal government to accept liability under state tort law on the same terms as a "private individual." § 2674. After all, no private individual could deploy *In re Neagle* to his advantage. It has only ever worked to shield "[f]ederal officers who are discharging their duties." *Ohio* v. *Thomas*, 173 U. S. 276, 283 (1899); see also *In re Neagle*, 135 U. S., at

62 ("officers and agents . . . acting . . . within the scope of their authority"); *Davis* v. *Burke*, 179 U. S. 399, 402 (1900) ("an officer of the United States [who] has been arrested under state process for acts done under the authority of the Federal government").[2]

To be sure, the government may raise other defenses against tort liability, and some may be uniquely federal in nature. After setting forth the general rule that the government can be held liable under state tort law on the same terms as a "private individual," §2674 adds that the government may "assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled." But none of these defenses include *In re Neagle*. That decision did not recognize a "judicial or legislative immunity." Nor has it been understood as a "defens[e] to which the United States is entitled," but instead (and again) as a shield "[f]ederal officers" may assert. *Thomas*, 173 U. S., at 283. Had Congress wanted to refashion *In re Neagle* into a new defense the government itself can assert under the FTCA, it might have said so. Yet it did not.

## IV

Where does all that leave the case before us? We can say this much: The plaintiffs' intentional-tort claims survive

---

[2] To date at least, this Court has also generally understood *In re Neagle* as providing federal officers a shield against only state criminal prosecution, not (as here) state tort liability. See, *e. g.*, *Thomas*, 173 U. S., at 283–285 (favorably citing *In re Waite*, a case holding that the defense would permit "a civil action for damages," even where it barred "a criminal prosecution," because a damages action, unlike a prosecution, would not bring the "federal and state governments into conflict," 81 F. 359, 363–364 (ND Iowa 1897)); *Johnson* v. *Maryland*, 254 U. S. 51, 56 (1920) (suggesting that the defense would not foreclose "liability under the common law of a State" for "negligence").

their encounter with subsection (h) thanks to the law enforcement proviso, as the Eleventh Circuit recognized. But it remains for that court on remand to consider whether subsection (a)'s discretionary-function exception bars either the plaintiffs' negligent- or intentional-tort claims. As we have explained, the Eleventh Circuit must undertake that assessment without reference to its mistaken view that the law enforcement proviso applies to subsection (a). Should some or all of the plaintiffs' claims survive the discretionary-function exception, the Eleventh Circuit must then ask whether, under Georgia state law, a "private individual under like circumstances" would be liable for the acts and omissions the plaintiffs allege, subject to the defenses discussed in § 2674—not a Supremacy Clause defense nowhere mentioned there.

Having resolved that much, the plaintiffs ask us to decide more still. See Brief for Petitioners 19–40. In particular, they call on us to determine whether and under what circumstances the discretionary-function exception bars suits for wrong-house raids and similar misconduct. Unless we take up that further question, they worry, the Eleventh Circuit on remand may take too broad a view of the exception and dismiss their claims again. After all, the plaintiffs observe, in the past that court has suggested that the discretionary-function exception bars any claim "*unless* a source of federal law 'specifically prescribes' a course of conduct" and thus deprives an official of all discretion. *Id.*, at 36 (quoting *Shivers* v. *United States*, 1 F. 4th 924, 931 (CA11 2021)). And that approach, the plaintiffs insist, is both seriously mistaken and at odds with how other circuits understand the exception. Brief for Petitioners 36. Some courts, for instance, have held that the discretionary-function exception does not protect conduct "marked by individual carelessness or laziness," rather than "policy considerations." *Rich* v. *United States*, 811 F. 3d 140, 147 (CA4 2015). Some courts do not apply the exception when law enforcement officers violate the plain-

SOTOMAYOR, J., concurring

tiffs' constitutional rights. *Xi*, 68 F. 4th, at 839 ("government officials never have discretion to violate the Constitution"). And some have indicated that the exception does not protect "ministerial" tasks. See *id.*, at 843 (Bibas, J., concurring). The plaintiffs ask us to endorse decisions like these, apply their reasoning to this case, and hold it survives the discretionary-function exception. Brief for Petitioners 39–40.

We readily acknowledge that different lower courts have taken different views of the discretionary-function exception. We acknowledge, too, that important questions surround whether and under what circumstances that exception may ever foreclose a suit like this one. But those questions lie well beyond the two we granted certiorari to address. And before addressing them, we would benefit from the Eleventh Circuit's careful reexamination of this case in the first instance. It is work enough for the day to answer the questions we took this case to resolve, clear away the two faulty assumptions on which that court has relied in the past, and redirect it to the proper inquiry.

The judgment of the Eleventh Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins, concurring.

I join in full the Court's opinion, which holds that the Eleventh Circuit's distinctive approach to suits under the Federal Tort Claims Act (FTCA) is wrong in two respects. See *ante*, at 403–404, 413–414. The law enforcement proviso modifies only the subsection in which it is located: Section 2680(h)'s intentional-tort exception. *Ante*, at 403–408. The United States, moreover, may not defeat an FTCA suit simply by "showing that a federal officer's acts had 'some nexus with furthering federal policy' and 'compl[ied] with the full range

of federal law.'"   *Ante*, at 409 (alteration in original).   With those two principles clarified, I also agree that the Eleventh Circuit must now consider on remand whether the FTCA's discretionary-function exception bars plaintiffs' negligent- and intentional-tort claims.   *Ante,* at 414–415.   I write separately to underscore that there is reason to think the discretionary-function exception may not apply to these claims.

I

The FTCA shields the United States from liability for claims "based upon" a federal employee's "exercise or performance" (or failure to exercise or perform) "a discretionary function or duty," "whether or not the discretion involved be abused."   28 U. S. C. § 2680(a).   This Court has set forth a two-part test that governs the application of § 2680(a), known as the discretionary-function exception.   First, courts must consider the nature of the official's conduct and decide whether it "'involv[es] an element of judgment or choice.'" *United States* v. *Gaubert*, 499 U. S. 315, 322 (1991) (quoting *Berkovitz* v. *United States*, 486 U. S. 531, 536 (1988)).   "The requirement of judgment or choice," this Court has explained, "is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'"   499 U. S., at 322.   In such circumstances, "'the employee has no rightful option but to adhere to the directive.'"   *Ibid.*

Even where a federal employee retains an element of choice, however, the exception does not apply reflexively. After all, it is rare for statutes or regulations to prescribe an official's required course of conduct down to the very last detail, so some degree of choice will almost invariably remain.   Thus, this Court has required lower courts to determine, at the second step, whether "th[e] judgment is of the kind that the discretionary function exception was designed to shield."   *Berkovitz*, 486 U. S., at 536.   Because "[t]he basis for the discretionary function exception was Congress'

desire to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,'" this Court has clarified that the exception protects only those governmental actions and decisions that are themselves "based on considerations of public policy." *Id.*, at 536–537 (quoting *United States* v. *S. A. Empresa De Viacao Aerea Rio Grandense*, 467 U. S. 797, 814 (1984)); see *Gaubert*, 499 U. S., at 323.

To that end, this Court has said, it is "obviou[s]" that some discretionary acts performed by Government agents "are within the scope of [their] employment but not within the discretionary function exception." *Id.*, at 325, n. 7. If a federal banking regulator "drove an automobile on a mission connected with his official duties and negligently collided with another car," for example, the Court has made clear that "the exception would not apply." *Ibid.* That is because, while "driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." *Ibid.*

It has been 34 years since this Court last weighed in on the discretionary-function exception, see *Gaubert*, 499 U. S. 315, and despite substantial percolation in the courts of appeals, the "exact boundaries of the exception remain unclear," 14 C. Wright, A. Miller, & H. Hershkoff, Federal Practice and Procedure § 3658.1 (4th ed. Supp. 2025). The Court today resolves one of the Circuit splits regarding the exception's application: whether claims that fall within the FTCA's law enforcement proviso must necessarily fall outside of the discretionary-function exception. Yet, as the Court recognizes, *ante*, at 414–415, several additional points of disagreement remain, including whether allegedly "unconstitutional conduct necessarily falls outside the exception" because officials lack discretion to violate the Constitution, and "whether the exception applies when the challenged act was careless

rather than a considered exercise of discretion." *Xi* v. *Haugen*, 68 F. 4th 824, 843 (CA3 2023) (Bibas, J., concurring) (describing these Circuit splits). Given the enduring questions about how to apply the discretionary-function exception, and the divergent approaches taken by the Circuits, it is long past time for this Court to weigh in on the exception's scope.

Even without further intervention by this Court, however, there is reason to question the Eleventh Circuit's suggestion in the decision below that the discretionary-function exception might apply "'*unless* a source of federal law "specifically prescribes" a [federal employee's] course of conduct.'" 2024 WL 1716235, *6 (2024) (quoting *Shivers* v. *United States*, 1 F. 4th 924, 931 (CA11 2021); emphasis in original). That approach, which even the Government does not defend before this Court, would run headlong into this Court's precedents. *Gaubert*, after all, applies the discretionary-function exception only where an official's actions both involve an element of judgment and rely on public policy considerations. See 499 U. S., at 322–323; see also *Berkovitz*, 486 U. S., at 536–537. Whether federal law prescribes a particular course of action resolves only the first of *Gaubert*'s two questions. The second question (whether an officer's decisions were "'based on considerations of public policy,'" 499 U. S., at 323) remains live. Were it otherwise, a federal official's negligent driving decisions would fall beyond the reach of the discretionary-function exception only if federal law or policy specifically prescribed an officer's permissible maneuvers on the road. Cf. *id.*, at 325, n. 7.

II

Agent Guerra's preparation to execute search and arrest warrants at 3741 Landau Lane, and his subsequent decision to raid Martin and Cliatt's home at 3756 Denville Trace, bear some resemblance to *Gaubert*'s negligent driving hypothetical. Like driving, executing a warrant always involves

some measure of discretion.   Yet it is hard to see how Guerra's conduct in this case, including his allegedly negligent choice to use his personal GPS and his failure to check the street sign or house number on the mailbox before breaking down Martin's door and terrorizing the home's occupants, involved the kind of policy judgments that the discretionary-function exception was designed to protect.

The FTCA's history, too, confirms Congress's intention to subject the United States to liability for intentional torts committed by law enforcement officers like Agent Guerra. The relevant context is as follows: For several decades after the FTCA's enactment, Congress retained the United States' sovereign immunity for myriad intentional torts committed by federal employees, including assault, battery, and false arrest.   See 28 U. S. C. § 2680(h).   That changed, however, in response to an episode that will sound familiar to readers of the majority opinion.   See *ante,* at 399–400.

In April 1973, Herbert and Evelyn Giglotto awoke in their Collinsville, Illinois, townhouse "to the sound of someone smashing down their door and bursting into their home."   J. Boger, M. Gitenstein, & P. Verkuil, The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis, 54 N. C. L. Rev. 497, 500 (1976).   After 15 state and federal officers ransacked the Giglottos' home, tied them up at gunpoint, and threatened to shoot Mr. Giglotto if he moved, the officers realized they " 'ha[d] the wrong people.' " *Ibid.*   The officers eventually moved on to the home of Donald Askew, where they terrorized yet another innocent couple before confessing they had acted on a " 'bad tip.' "   *Id.*, at 501.

The Collinsville raids garnered national attention, including from the United States Senate.   See S. Rep. No. 93–588, pp. 2–3 (1973); see also Brief for Members of Congress as *Amici Curiae* 8–12.   Noting that "[t]here [was] no effective legal remedy against the Federal Government for the actual physical damage, much less the pain, suffering and humilia-

tion to which the Collinsville families ha[d] been subjected," the Senate Committee on Government Operations proposed an amendment to the FTCA. See S. Rep. No. 93–588, at 2. The solution was to add a proviso to the end of the intentional-tort exception that "deprive[s] the Federal Government of the defense of sovereign immunity" for FTCA suits arising out of the state-law torts of "assault, battery, false imprisonment, false arrest, malicious prosecution, or abuse of process" by federal law enforcement officers. *Id.*, at 3; see § 2680(h). The Committee designed the proviso to ensure "innocent individuals who are subjected to raids of the type conducted in Collinsville, Illinois, will have a cause of action against the individual Federal agents [via suits under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971)] *and* the Federal Government [through the FTCA]." *Id.*, at 3 (emphasis added).

Of course, the majority correctly holds that the proviso does not altogether trump the discretionary-function exception: Even if an intentional-tort claim "survive[s its] encounter with subsection (h) thanks to the law enforcement proviso," courts must nevertheless consider whether "subsection (a)'s discretionary-function exception bars . . . the plaintiffs' negligent- or intentional-tort claims." *Ante*, at 413–414. Courts, however, should not ignore the existence of the law enforcement proviso, or the factual context that inspired its passage, when construing the discretionary-function exception. Whatever else is true of that exception, any interpretation should allow for liability in the very cases Congress amended the FTCA to remedy. See *Van Buren* v. *United States*, 593 U. S. 374, 393 (2021) ("'When Congress amends legislation, courts must presume it intends the change to have real and substantial effect'"); see also *Hungary* v. *Simon*, 604 U. S. 115, 132 (2025) (relying on a statute's "'historical backdrop'" to "'permit adjudication of claims'" that an earlier decision of this Court had avoided).

SOTOMAYOR, J., concurring

\*     \*     \*

On remand, the court should approach the discretionary-function exception with an eye to both steps of the *Gaubert* analysis and to the existence and context of the intentional-tort exception's law enforcement proviso.

Page Proof Pending Publication

## Reporter's Note

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 401, line 11: "against" is changed to "by"
p. 419, line 20: "house" is changed to "home"